■ ERIC ALTERMAN et. al., Infants, by CARL J. ALTERMAN, Their Parent, Respondents, v CHRONETICS, INC., et al., Respondents, and JEANNETTE TAUGER, Intervenor-Appellant.—In a special proceeding by judgment creditors of Fernglen Trading Corp. to require Chronetics, Inc., and R. S. S. Resistance Corp. (R. S. S.), alleged debtors of Fernglen Trading Corp., to pay them the amount of their judgments, intervenor Jeannette Tauger appeals from a judgment of the Supreme Court, Westchester County, entered July 27, 1976, which, after a nonjury trial, is in favor of petitioners and against R. S. S. Judgment reversed, on the law and facts, and new trial granted, with costs to abide the event. Petitioners, as assignees of Carl J. Alterman, had obtained judgments against Fernglen Trading Corp. in the Civil Court, New York County, in the sum of $6,675. By this proceeding they seek to have their judgment execution applied to past due indebtednesses of Chronetics, Inc. (now in bankruptcy), and R. S. S. to Fernglen, which indebtednesses are in a sum in excess of their judgments. Their petition was granted by Special Term after a nonjury trial. Appellant claims that the underlying facts show that this case involves more than a judgment creditor's right to have the execution attach to a debt owed to the judgment debtor, in that the debt sought to be attached is one subject to an equitable trust in which Alterman's beneficiary interest is only about 3%. Beginning in about 1963, various associates and acquaintances of the principals of Chronetics loaned moneys to it; Fernglen Trading Corp. was incorporated at about that time. It would appear (although the record is not entirely clear) that at some time Fernglen delivered its promissory notes to each of the individual lenders for the amounts of their respective loans and, in turn, Chronetics acknowledged its indebtedness to Fernglen for the sum of the moneys advanced by the individuals. In connection with a public sale of its stock in January, 1968, Chronetics filed papers with the Securities and Exchange Commission; those set forth the following statement: "On July 31, 1967 the Company entered

into an agreement with Fernglen for the repayment of the balance due Fernglen in ten annual installments of $23,000 each, commencing October 15, 1968, with interest payable monthly at 10% per annum. The Company is not required to make any principal payments in excess of its net income after taxes but deficiences in payments are required to be paid out of available net income the following year. The company may prepay out of excess net income to be applied to the next succeeding Year." Its obvious purpose was to give assurance that the proceeds of the sale would not be used to "bail out" the $230,000 indebtedness. The offering was approved and the public offering was made. Apparently it was only in the first year that there was a profit; as a result only the first principal installment of $23,000 was made. However, for a time, interest payments were regularly made, the last of which was in July, 1974. It is undenied that when Fernglen received these payments it, in turn, made pro rata payments to the individual lenders. At present there are eight such lenders, including Carl Alterman and the intervenor, Jeannette Tauger. At the time of the public offering Mr. Alterman, in addition to being one of the lenders, was an officer of Chronetics, to wit, vice-president. The undenied testimony of Chronetics' past chairman of the board was that Mr. Alterman was "part of the inner management and decision-making process to deal with the debt owed to Fernglen." In February, 1973, the "General Resistance" division of Chronetics was spun off to R. S. S.; as part of the consideration R. S. S. assumed one half of the remaining indebtedness of Chronetics to Fernglen (including one half of the unconditional obligation to pay 10% interest on the remaining principal). Thus, Alterman's assignees seek to attach the lien of their judgment execution upon R. S. S. as well as upon Chronetics' obligation to pay the interest owing to Fernglen. (Chronetics is now in bankruptcy proceedings.) We conclude that if the facts show that to the knowledge of Mr. Alterman the primary function of Fernglen was to act as a conduit for the individual lenders, the assignees of Mr. Alterman may be estopped from asserting their judgment-execution lien against the indebtedness of R. S. S. to Fernglen. If it is a fact (and the record is not entirely clear as to this) that the individual lenders had properly been led to believe that no lender would seek to enforce his claim against Fernglen by disproportionate collection from Chronetics' or R. S. S.' obligation to pay interest, the classic requirements of estoppel would be satisfied (see *Metro-Burek v Rosenthal & Rosenthal,* 51 AD2d 1003). Paraphrasing from *Metro-Burek,* the other individual lenders might well have resorted to their own collection procedure and not relied upon the understanding that all receipts by Fernglen from Chronetics and R. S. S. were to be distributed by Fernglen to the individual lenders on a pro rata basis, had they known what Mr. Alterman (or his assignees) was going to do. We have therefore granted a new trial for a determination of whether the necessary elements of estoppel, as herein indicated, are present. If they are, the special proceeding should be dismissed. Hopkins, Acting P. J., Martuscello, Cohalan and Damiani, JJ., concur.